**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION |
| | No. 08-3301 |
| THIS DOCUMENT RELATES TO: | **Hon. Anita B. Brody** |
| Indirect Purchaser Actions | |

| | |
|---|---|
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated, | CIVIL ACTION |
| Plaintiff, | No. 12-4212 |
| v. | **Hon. Anita B. Brody** |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc, | |
| Defendant. | |

June 19, 2013                                                              ANITA B. BRODY, J.

**<u>MEMORANDUM</u>**

    Following nearly five years of antitrust class action litigation between the makers of

branded Flonase nasal spray, the makers of a generic brand version, indirect purchasers of the

drug, and direct purchasers, the parties reached a global settlement in January 2013. Before me

now is the Indirect Purchaser Plaintiffs' ("IPPs") Motion for Final Approval of Settlement (Doc.

No. 574). After holding a fairness hearing on June 3, 203 and reviewing post-hearing

submissions, I will now approve the final settlement agreement and allocation plan. I will also

grant counsel's request for attorneys' fees, reimbursement of expenses, and incentive awards for class representative.

## I.    Background

Named plaintiffs A.F. of L.-A.G.C. Building Trades Welfare Plan ("AFL"), IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30 Health & Welfare Fund ("Painters"), and Andrea Kehoe ("Kehoe"), collectively "Indirect Purchasers," are indirect purchasers of the prescription drug Flonase and its generic equivalent. Flonase is the brand-name version of fluticasone propionate ("FP"), a nasal corticosteroid used to treat nasal inflammation caused by allergies and manufactured by Defendant SmithKline Beecham Corp., d/b/a GlaxoSmithKline PLC ("GSK"). Indirect Purchasers allege that GSK filed sham citizen petitions with the Food and Drug Administration to delay the entry of a cheaper, generic version of Flonase into the market, resulting in overcharges to the indirect purchasers.

This case has an extensive litigation history. The first Indirect Purchaser complaint was filed against GSK in July 2008.[1] Extensive discovery began in late 2008 and continued through mid-2010, including 30 depositions of current and former employees of GSK and Roxane Laboratories ("Roxane"), the maker of generic FP. Over a dozen expert reports and rebuttals were submitted. After extensive oral argument, I certified a class of indirect purchasers defined as follows:

A. *With respect to the monopolization and UDTP claims*

(1) For the Class Period from August 2004 through March 2006

All persons or entities throughout the United States and its territories who from August 2004 through March 2006 purchased, paid for, and/or reimbursed for branded Flonase in any of the following four states—

---

[1] Related cases were also filed by direct purchasers of the drug (No. 08-3301) and Roxane Laboratories ("Roxane") (No. 09-1638), the maker of a generic competitor to Flonase.

Arizona, Florida, Massachusetts, or Wisconsin. These persons or entities must have also purchased, paid for, and/or reimbursed for an AB-rated generic fluticasone propionate nasal spray equivalent of branded Flonase ("generic FP") from March 2006 to March 2009 in the same designated state in which the Flonase purchase was made.

(2) For the Class Period from March 2006 through March 2009

All persons or entities throughout the United States and its territories who from March 2006 to March 2009 purchased, paid for, and/or reimbursed for generic FP in the following states—Arizona, Florida, Massachusetts, or Wisconsin.

B. *With respect to the unjust enrichment claims*

(1) All persons or entities throughout the United States and its territories who from August 2004 through March 2006 purchased, paid for, and/or reimbursed for branded Flonase in any of the following three states— Arizona, Massachusetts, or Wisconsin. These persons or entities must have also purchased, paid for, and/or reimbursed for generic FP from March 2006 to March 2009 in the same designated state in which the Flonase purchase was made.

C. For purposes of the class definition, the Flonase and/or generic FP drugs must have been intended for consumption by the class members, their families or their members, employees, plan participants, beneficiaries, or insureds.

D. The following are excluded from the class:

(1) GSK and its respective subsidiaries and affiliates;

(2) all governmental entities (except for government funded employee benefit plans);

(3) all persons or entities that purchased FP nasal spray, including Flonase, for purposes of resale or directly from GSK to the extent and solely to the extent of such purpose for resale or as a direct purchase;

(4) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand name drug purchases;

(5) fully insured health plans, i.e. plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members; and

(6) insured individuals who purchased only generic FP (never branded Flonase) and whose health plans imposed a flat dollar co-pay applicable to generic drugs.

*In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 216 (E.D. Pa. 2012).

In 2011, I denied two separate GSK motions for summary judgment, one on causation, and one on *Noerr-Pennington* immunity. *See* 798 F.Supp.2d 619 (E.D. Pa. 2011) and 795 F.Supp.2d 300 (E.D. Pa. 2011), respectively. The case was set for trial in early 2013, and both sides submitted over a dozen motions *in limine*. After extensive and vigorous settlement negotiations conducted by me in my chambers, over the course of multiple days, the parties reached a settlement agreement in November 2012, whereby GSK agreed to pay $46 million in exchange for the settlement of all indirect purchaser claims. That total includes an $11 million initial payment to a group of large health insurers (described below as the "SHPs") and a $35 million payment for the remainder of the Indirect Purchaser Class. I preliminarily approved the settlement on January 14, 2013.

## II.    Final Approval of Settlement

According to Federal Rule of Civil Procedure 23(e), "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." In other words, "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.' " *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 316 (3d Cir.1998) (quoting *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995)).

The Third Circuit applies a nine prong test, known as the *Girsh* factors, when determining the fairness, adequacy, and reasonableness of a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the

range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (internal quotation marks and ellipses omitted).

In more recent decisions, the Third Circuit has suggested an expansion of the nine-prong test when appropriate to include what are now referred to as *Prudential* considerations, such as:

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for *335 individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential*, 148 F.3d at 323; *see also In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 350 (3d Cir.2010). District courts "must make findings as to each of the Girsh factors, and the *Prudential* factors where appropriate," and "cannot substitute the parties' assurances or conclusory statements for [their] independent analysis of the settlement terms." *In re Pet Food.* 629 F.3d at 350–51.

Here, the Girsh factors and relevant Prudential considerations weigh in favor of settlement approval.

## A. The Complexity, Expense, and Likely Duration of the Litigation

This suit involves highly complex antitrust issues, FDA bioequivalence standards for suspension nasal spray products, pharmaceutical manufacturing and supply issues, and pharmaceutical regulatory issues, all of which were investigated and litigated for more than four years. Antitrust class actions are particularly complex to litigate and therefore quite expensive.

5

*See In re Auto. Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *14 (E.D. Pa. Jan. 3, 2009) ("This litigation, like most antitrust cases, has been exceedingly complex, expensive, and lengthy.") (emphasis added). " 'An antitrust class action is arguably the most complex action to prosecute. . . .' " *In re Linerboard Antitrust Litig.*, 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (quoting *In re Motorsports Merchandise Antitrust Litig.*, 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000)). The DPs and GSK reached this settlement after they had completed significant preparation for trial, including litigating *Daubert* challenges, identifying hundreds of trial exhibits, and briefing over a dozen motions *in limine* between them. The settlement avoided the need for a difficult and expensive multi-week trial involving complex scientific and regulatory testimony, and the time and expense associated with the appeal that would likely have followed a verdict. This factor strongly supports settlement.

**B. The Reaction of the Class to the Settlement**

Class counsel developed the notice plan in close consultation with the Settlement Administrator, Rust Consulting, Inc. and its legal notice affiliate, Kinsella Media LLC. After I preliminarily approved the settlement, a Postcard Notice was sent via USPS First Class mail to the Third Party Payor ("TPPs") members of the class, using Rust Consulting's proprietary list of roughly 40,000 addresses for TPPs and their agents. In addition, a notice was published in a variety of national publications that were specifically selected to reach the age and gender targets most representative of Flonase users. Notice also appeared in an insert in newspapers and periodicals in the U.S. Territories, and a TPP notice appeared in an industry trade journal. Finally, targeted internet banner ads were published for 30 days. Through this notice plan, it was estimated that 80 percent of medication users were able to see the notice.

The reaction of the class has been overwhelmingly positive. As of March 22, 2013, 8,065 consumer claim forms had been downloaded from the website. By May 28, 2013, 251 TPP Proofs of Claim with a value of nearly $750 million and 1,908 Consumer Proofs of Claim with a value of nearly $900,000 have been filed. Only one consumer requested exclusion from the class, though his exclusion does not appear related to the merits of the settlement. *See* Decl. of Marvin Miller in Further Support of Plaintiffs' Motion for Final Approval at 2, Doc. No. 591. Two consumer objections were filed on the deadline for objections.[2] Both raise nearly identical objections: (1) that the notice is unclear and difficult to understand; (2) that the class representative awards are excessive; and (3) that the attorneys' fees are excessive. However, I will strike both objections because neither objection contained any proof whatsoever that the objector was actually a member of the class.

The notice that was approved in my preliminary approval order informs class members that they must file with their objection proof of membership in the class. *See* Doc. No. 570, Attachment 1 at 8-9. Jill Jan, who does not appear to be a licensed attorney, purported to file an objection on behalf of her son Hondo Jan, who was a minor during the class period but who now appears to be of majority age.[3] Jan declares that she had prescriptions of Flonase filled for Hondo in 2004-2005, and stated that she "made purchases" of Flonase at Rite Aid, Walgreens, and Longs. However, she provides no proof except for a doctor's note dated October 3, 2003— before the class period—referring to Flonase as a "current medication" of Hondo's. Jan

---

[2] In fact, only one objection, that of Jill Jan, was properly filed through ECF by the May 3, 2013 deadline (Doc. No. 580). A second objector, James Payton, attempted to file his objection through his attorney on May 3 but it was not actually filed on ECF until May 7, 2013 (Doc. No. 584).

[3] Exhibit A of Jan's objection, a letter from an allergist, appears to provide Hondo's date of birth as November 1, 1991, making him over 18, the age of majority in his home state of California. *See* Cal. Fam. Code § 6501 (West).

Objection Ex. A. The Payton objection includes even less: a simple declaration from Payton that he was "prescribed and was taking the medication, Flonase" and that he was "insured through Kaiser during 2004 and 2009 and co-pays were required." He does not state that he *purchased* Flonase, or that the purchasers were made during the relevant class period, let alone provide receipts that would establish class membership. Because neither objection demonstrates that the objector is actually a member of the class, I will strike those objections.[4]

Even if I were to consider Jan's and Payton's objections to the class notice on the merits, I still find that notice was reasonable and that the reaction of the class weighs in favor of approval of the settlement. Both Jan and Payton objects that the notice is unclear because it does not explain what specific benefit each individual can expect to receive. Here, the notice adequately explained that class members will receive a *pro rata* share of the net settlement fund. More specific figures cannot be provided, because it depends on how many individuals file claims, and what share of the total relevant purchases each individual's relevant purchases represent. In this settlement, every dollar of the net settlement fund will be distributed to the class; the exact figure, however, cannot be determined until all the claims have been submitted and processed.

In sum, even if the objections are considered, the reaction of the class to the settlement agreement has been overwhelmingly positive, with only one exclusion and two objections. These objections are procedurally deficient; moreover, their substantive complaints about the notice are meritless. Therefore, this factor counsels in favor of approval of the settlement.

---

[4] There are other reasons to strike the objections. As to Payton's objection, it was not filed until four days past the deadline. As for Jan, she does not appear to be a licensed attorney and cannot file an objection on behalf of her son, who is an adult and must pursue his own claim. Jan cannot legally represent her adult son. As to Palmer's objection, it was filed past the deadline and is therefore untimely.

### C. The Stage of the Proceedings and the Amount of Discovery Completed

These proceedings advanced to a sufficiently late stage prior to settlement that the related

*Girsh* and *Prudential* factors also weigh in favor of approval. Explaining the rationale behind the

third *Girsh* factor, the Third Circuit wrote in *Prudential*:

> The parties must have an "adequate appreciation of the merits of the case before negotiating." To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

*In re Prudential*, 148 F.3d at 319 (quoting *In re G.M.,* 55 F.3d at 813). Further, "courts generally

recognize that a proposed class action settlement is presumptively valid where . . . the parties

engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med*

*Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000).

This factor also weighs strongly in favor of approval of the settlement agreement. This

case was very advanced by the time the agreement was reached. Fact discovery concluded in

February 2010 and included 45 depositions and millions of pages of documents. Expert

discovery concluded in September 20110 and included the exchange of numerous expert reports.

The parties briefed two separate motions for summary judgment. The Court heard *Daubert*

motions concerning experts on both sides on two separate occasions. By the time the agreement

was reached, the parties had exchanged trial witness lists, conferred on trial exhibits and

deposition testimony to be used at trial, and submitted pretrial memoranda. Trial was just two

months away when the parties reached their agreement.

### D. The Risks of Establishing Liability and Damages.

These two *Girsh* factors are closely related, so I will address them together. This case

involved complex scientific, regulatory, and legal issues, and plaintiffs faced many obstacles to

success at trial. Among other things the Plaintiff would have to prove were two particularly

difficult propositions: First, they would have had to prove that GSK's petitions to the FDA regarding generic FP were objectively baseless and that GSK could not have reasonably expected success on the merits of any of its requests to the FDA. Second, and most crucially, Plaintiffs would have had to prove that GKS's petitions to the FDA were a substantial cause of any delay in the approval of Roxane's generic FP, and that, but for GSK's actions, Roxane would have had the manufacturing capability to get its product to market sooner. These difficulties go both to Plaintiffs' case for liability and their case for damages, as they would have had to show that GSK's actions resulted in improper overcharges to the DPs. After facilitating these extensive settlement negotiations, I can attest to the challenges Plaintiffs would have faced in establishing the amount of their damages. Given the complexity of these issues, there is no guarantee that a jury would have found GSK liable, or how the jury would have responded to the complicated economic data necessary to show damages. Therefore, these two factors counsel in favor of settlement.

### E. The Risks of Maintaining the Class Action Through Trial

Although I already certified the Indirect Purchaser class here, class certification is subject to review and modification at any time during the litigation. *See Zenith Lab., Inc. v. Carter–Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir.1976). The Third Circuit noted,

> Because the district court always possesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory. There will always be a "risk" or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement.

*In re Prudentia*l, 148 F.3d at 321. Since I certified this class a year ago, the Supreme Court released *Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2012), which held that damages must be able to be measured classwide in order to sustain class certification.

This opinion arguably renders class certification in cases like this one more difficult to prove. Because Plaintiffs would have faced a risk in maintaining a certified class throughout trial, this factor weighs in favor of approving the settlement.

## F. The Ability of the Defendants to Withstand a Greater Judgment

This factor is also neutral. The ability of defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241, 254 (E.D.Pa.2011). That does not appear to be the case. I have not been presented with any evidence indicating that GSK is at risk of insolvency. Regardless, I follow my district court colleagues within the Third Circuit who "regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, at *15, 2011 U.S. Dist. LEXIS 38663, at *42 (D.N.J. Apr. 8, 2011) (citing *McCoy v. Health Net. Inc.*, 569 F.Supp.2d 448, 462 (D.N.J.2008); *Weber v. Gov't Emples. Ins. Co.*, 262 F.R.D. 431, 446 (D.N.J.2009)). Therefore, this *Girsh* factor neither supports nor undercuts the parties' settlement.

## G. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

Taken together, the final two *Girsh* factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004). These factors confirm that the settlement here should be approved. A proposed settlement totaling a cash payment of $46 million, with $35 million going to the non-SHP Indirect Purchaser Class, is reasonable both in absolute terms and in light of the circumstances of this litigation, particularly the risks of establishing liability at trial. Under the settlement, each class

member can benefit from the fund immediately, and avoid the uncertainties and delay inherent in continuing to litigate this complex class action.

In *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig*., the Third Circuit warned "against demanding too large a settlement ... after all, settlement is a compromise, yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d 768, 806 (3d Cir.1995). With that warning in mind, I agree with class counsel and find that the $46 million amount, with $35 million going to the non-SHP Indirect Purchaser Class, is reasonable. Therefore, this factor weighs in favor of settlement.

## H. *Prudential* Factors

In *Prudential*, the Third Circuit noted that, "since *Girsh* was decided in 1975, there has been a sea-change in the nature of class actions," noting that it therefore "may be useful to expand the traditional *Girsh* factors" to add additional topics for the district courts to take into consideration when reviewing a proposed settlement agreement. *In re: Prudential Ins. Co. of Am. Sales Practice Litig*., 148 F.3d 283 (3d Cir.1998). Here, the relevant *Prudential* factors counsel in favor of approving the settlement. First, as has been explained above, the case was settled only after extensive discovery and trial preparation. The underlying substantive issues were therefore well-developed, supporting approval of the settlement. Second, as to the results achieved for the individual class members compared to those achieved for other claimants, the settlement creates the only award for class members, and is thus beneficial to all indirect purchasers. Third, only one class member has opted out of the settlement, and he indicated his decision had nothing to do with the merits of the settlement. As to attorneys' fees, as I will discuss in the next section, the provisions for attorneys' fees are reasonable. Next, the procedure for processing individual claims under the settlement is fair and reasonable.

The *Girsh* factors and the *Prudential* factors all weigh strongly in favor of approval of the class settlement. I therefore find the settlement to be fair, reasonable, and adequate.

### III.    Attorneys' Fees and Expenses

Class counsel seeks (i) an award of attorneys' fees in the amount of $11,655,000, or one-third of the $35 million settlement fund (plus interest); (ii) reimbursement for litigation costs and expenses totaling $1,848,720.15; and (iii) approval of an incentive award of $25,000 each to the AFL Plan, the IBEW Plan, Painters District Council, and Medical Mutual of Omaha and $10,000 to Andrea Kehoe.

Federal Rule of Civil Procedure 23(h) states: "In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." Class counsel informed the class in the long-form notice that it would ask the Court to award attorneys' fees "in an amount not to exceed one-third of the Settlement Fund, plus interest." Preliminary Approval, Attachment 1, Doc. No. 570. Nonetheless, "a thorough judicial review of fee applications is required in all class action settlements." *In re Prudential,* 148 F.3d at 333 (quoting *In re G.M.*, 55 F.3d at 819).

Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method. *In re Prudential,* 148 F.3d at 333. The former is "more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* The latter method, on the other hand, is "generally favored in cases involving a common fund . . . ." *Id.* Either way, "it is sensible for a court to use a second method of fee

approval to cross-check its initial fee calculation." *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 300 (3d Cir. 2005).

## A. Applying the *Gunter* Factors

The settlement agreement at issue here establishes a common fund of $35 million, from which the class members will receive their allocations and the attorneys will receive any award and expense reimbursement. "[I]n the traditional common fund situation ... the district court ... should attempt to establish a percentage fee arrangement agreeable to the Bench and plaintiff's counsel." *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985). In order to make that determination, the Third Circuit has identified ten factors for the Bench to consider. These include:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig*., 582 F.3d 524, 541 (3d Cir.2009) (citing *Gunter v. Ridgewood Energy Corp*., 223 F.3d 190, 195 (3d Cir.2000); *In re Prudential*, 148 F.3d at 336–40). These *Gunter/ Prudential* factors are not exhaustive, and a district court should consider "'any other factors that are useful and relevant with respect to the particular facts of the case.'" *In re Diet Drugs*, 582 F.3d at 541 n. 34 (quoting *In re AT & T Corp. Sec. Litig*., 455 F.3d 160, 166 (3d Cir.2006)).

## 1. The size of the fund created and the number of beneficiaries

The settlement creates a $35 million settlement fund. The indirect purchaser class members will receive a *pro rata* share based on their purchases of Flonase from the net fund, after attorneys' fees, expenses, and incentive awards, plus accrued interest, are removed. This is a sizeable settlement, and provides immediate and certain payment to the class members. Every dollar of the net fund will be distributed to class members. This factor counsels in favor of approval of the requested fee.

## 2. The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel

As discussed above, there were two objections filed, though only one was timely. They both purport to object to the attorneys' fees. Jan states only that a one-third award is "too much" and states that the lawyers should not receive more than the class. Payton argues that the reasonableness of the fees cannot be determined until the SHPs have been paid; otherwise, the requested $11,655,000 may be more than one-third of what is actually left for the class. Although I have decided to strike both objections, I will still address their substantive arguments.

Payton misunderstands the settlement. The SHPs are TPPs that would have been members of the Class but for their separate settlement. Under the provisions of the Settlement Agreement, the SHP Agreement, and the class Plan of Allocation, if the SHPs' *pro rata* share of qualifying purchases entitles them to money from the $35 million settlement fund (i.e., if the $11 million received already is insufficient to meet their *pro rata* share), that amount takes into account their share of the fees on the $35 million. In other words, remaining members of the Class would still be paying only one-third of their allocation of the fund. The entire net settlement amount will be going to

class members, based on *pro rata* divisions. Therefore, a percentage-based fee will always reflect a percentage of the funds going to the class itself.

These objections are procedurally deficient and need not be considered. Regardless, on the merits they raise no "substantial" objection to the attorneys' fee proposal. This factor therefore supports approval of the requested fee.

### 3. The skill and efficiency of the attorneys involved

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Id. at 198. The *Cullen* court explained that "[t]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." *Cullen v. Whitman Medical Corp*., 197 F.R.D. 136, 149 (E.D. Pa. 2000).

Class counsel are highly regarded in the complex class action and antitrust communities. The manner in which they conducted this complicated and lengthy litigation demonstrates skill and expertise. Indeed, counsel for both sides were knowledgeable, tenacious, and highly skillful. As discussed above, the settlement award represents a substantial amount and clearly demonstrates the value of class counsel's efforts. This factor supports approval of the requested fee.

### 4. The complexity and duration of the litigation

I have already addressed this matter above in my discussion of the *Girsh* factors. This factor weighs strongly in favor of the proposed fee.

### 5. The risk of nonpayment

The risk of nonpayment here was not negligible. Even if Plaintiffs had succeeded in proving liability at trial, there is no guarantee they would have recovered damages.

*See, e.g., U.S. Football League v. National Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) (noting the jury's award of only $1 in nominal damages to the plaintiffs). Moreover, as a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. Throughout this lengthy litigation, class counsel have not received any payment. This factor supports approval of the requested fee.

**6. The amount of time devoted to the case by plaintiffs' counsel**

According to their declaration, class counsel spent more than 32,700 hours over the course of more than four years litigating this case. The record of this litigation also indicates that the time spent by Plaintiffs' counsel was necessary for the successful prosecution of this case, considering both the complexity of the issues and the robust defense mounted by the defendants. This factor weighs in favor of the requested fee.

**7. The awards in similar cases**

A one-third fee award is standard in complex antitrust cases of this kind. Indeed, a one-third award "is consistent with awards in other complex antitrust actions involving the pharmaceutical industry." *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-0085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) (citing I*n re Relafen Antitrust Litig.*, No. 01-12239-WGY (D. Mass. April 9, 2004) (awarding 33.33 % fee of a $175 million settlement); *In re Buspirone Antitrust Litig.*, No. 01-CV-7951 (JGK) (S.D.N.Y. April 1, 2003) (awarding a 33.33 % fee of a $220 million settlement); *North Shore Hematology-Oncology Associates*, P.C. v. Bristol Myers Squibb Co., No. 1:04cv248 (EGS) (D.D.C. Nov. 30, 2004) (awarding a 33.33 % fee of a $50 million settlement); *In re Terazosin Hydrocholride Antitrust Litig.*, No. 99-MDL-1317 (S.D. Fla. Apr. 19, 2005); (awarding a 33.33 % fee of a $72.5 million settlement)). The complexity of this litigation,

combined with the contingent nature of class counsel's representation, warrant the requested one-third fee award.

**8. The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations**

Class counsel was not assisted by a government investigation. In *Prudential*, the Third Circuit singled this factor out for important consideration by district courts. *See In re Prudential*, 148 F.3d at 338. The appeals court remanded the trial court's fee award for wrongly "credit[ing] class counsel with creating the entire value of the settlement" and overlooking the considerable contributions of a multi-state life insurance task force. *Id.* Yet this case is more similar to *In re AT & T*, in which the Third Circuit found that "class counsel was not aided by the efforts of any governmental group, and the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel." *In re AT & T*, 455 F.3d at 173. This factor weighs in favor of the proposed fee.

**9. The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained**

It is extremely difficult to determine what fee would have been negotiated at the outset of the litigation. I can only look to my colleagues who have attempted to apply this factor, even though I recognize that the contingent fee can only be "based on the particular facts and circumstances of the specific litigation under consideration." *In re United States Bioscience Sec. Litig.*, 155 F.R.D. 116, 119 (E.D.Pa.1994). After appointing a Special Master to study the award of attorneys' fees in a class action securities suit, Judge Dalzell approved of the Special Master's recommendation that a thirty percent fee award was an appropriate estimate of what would have been negotiated.

*See id.* (citing Report and Recommendation of Special Master Judge Arlin M. Adams).

Judge Katz noted that in private contingency fee cases, "plaintiffs' counsel routinely

negotiate agreements providing for between thirty and forty percent of any recovery." *In*

*re Ikon*, 194 F.R.D. at 194. But Judge Katz was referring to tort matters, in particular.

In the end, I do "not give great weight to this hypothetical exercise." *In re*

*Prudential*, 148 F.3d at 340. Although this is not a proposed settlement in the range of

*Prudential*'s $1 billion, this is still a significant sum of money that should not be

subjected to such arbitrary calculations. Therefore, this factor is neutral and will not be

considered to count for or against the proposed fee request.

### 10. Any innovative terms of settlement.

The terms of this settlement are relatively standard. In the absence of any innovative terms,

this factor neither weighs in favor nor against the proposed fee request.

### 11. Summation

I recognize that the *Gunter*/*Prudential* factors "'need not be applied in a formulaic way'

because each case is different, 'and in certain cases, one factor may outweigh the rest.'" *In re AT*

*& T*, 455 F.3d at 166 (citing *In re Rite Aid*. 396 F.3d at 301). This case, however, does not

"involv[e] [an] extremely large settlement award[ ]," and therefore I am not as inclined to "give

some of these factors less weight in evaluating a fee award." *In re AT & T*, 455 F.3d at 166. In

sum, after "'engag[ing] in a robust assessment [ ] of the fee award reasonableness factors,'" I

have determined that eight of the ten *Gunter*/*Prudential* factors count in favor, while the

remaining two are neutral. *Id.* (citing *In re Rite Aid*, 396 F.3d at 302). Therefore, there is

overwhelming support for the proposed fee. The lodestar cross-check, moreover, militates in

favor of approval.

### B. Lodestar

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid*, 396 F.3d at 305. Once the lodestar is calculated, "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases." Manual for Complex Litigation (Fourth) § 14.122 (2004).

#### 1. Number of Hours and Hourly Rates

Class counsel reports that they cumulatively spent more than 37,761.95 hours litigating this case over the last nearly five years. Fifteen different firms worked on the Plaintiffs' case, though the vast majority of hours were logged by the two lead counsel firms, Miller Law LLC and Pomerantz Grossman Hufford Dahlstrom & Gross LLP, who collectively reported more than 25,000 hours of work on the case. Class counsel submitted copies of their time and expense records for in camera review. The nearly five years of work included, among other work, preparing the complaint; conducting extensive discovery including taking dozens of depositions of current and former employees of GSK and Roxane; filing for class certification; submitting over a dozen opening and rebuttal expert reports; opening and defending *Daubert* challenges; defending two separate motions for summary judgment; and preparing for trial, including filing and defending against motions *in limine*. The law firms charged different amounts based on their average billable rates and the individual attorney or staff member working on the assignment; each firm's average billable rate ranged from $275 to $750 per hour.

In total, class counsel reports that they spent 32,761.95 hours, which cost a total of $17,280,746.50 at the firms' various current hourly billing rates. That averages to a billing rate of $527 per hour. The lodestar amount is therefore $17,280,746.50 as of January 31, 2013.

### 2. Lodestar Multiplier

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier." *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 539 (3d Cir.2009) (citing *In re Rite Aid*, 396 F.3d at 305–06). The Third Circuit explained that "multipliers may reflect the risks of non-recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for extraordinary result. By nature they are discretionary and not susceptible to objective calculation." *In re Prudential*, 148 F.3d at 340. The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ($11,655,000) by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates ($17,280,746.50). Here, that calculation comes to a negative multiplier of 0.67, meaning class counsel would receive *less* under a percentage fee award than their regular billing rates. The Third Circuit has recognized that "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 150 (2000) (Brody, J.) (internal quotation omitted). *See also In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir.2001) (citing *In re Prudential*, 148 F.3d at 341).

A negative multiplier strongly underscores the risk counsel accepted to prosecute this case to trial. As the Third Circuit explained, "The lodestar multiplier . . . was less than one and thus reveals that Class Counsel's fee request constitutes only a fraction of the work they billed." *In re Ins. Brokerage Antit. Litig.*, 579 F.3d 241, 284 (3d Cir. 2009). The lodestar crosscheck

therefore provides additional support for approving the attorneys' fees request. Thus I will award counsel thirty-three and a third percent of the common fund, for a total of $11,655,000 in attorneys' fees.

### C. Costs

Class counsel requests reimbursement of $1,848,720.15 for expenses incurred litigating the case. Nearly half fees paid to experts, investigators, accountants, etc. Another substantial portion was for assessment payments to the litigation fund Co-Lead Counsel established for the common expenses incurred in the prosecution of this case. Counsel had a strong incentive to conserve their expenses, given that they were incurred with no guarantee of recovery. I find that these expenses were reasonable and proper. Therefore, I will award counsel a reimbursement of these expenses from the settlement fund.

### IV.    Incentive Awards for Class Representatives

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997). As a matter of practice, "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Id.* (citing numerous cases in which incentive awards were granted). I agree with my colleagues who have held that "[r]easonable payments are permissible to compensate named plaintiffs for the expenses they incur during the course of class action litigation." *First State Orthopaedics v. Concentra. Inc.*, 534 F.Supp.2d 500, 524–25 (E.D. Pa.2007) (referencing *Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL 950616, at *24 (E.D. Pa. April 22, 2005); *Godshall v. Franklin Mint Co.*, No. 01-6539, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004,)).

Plaintiffs seek and incentive award of $25,000 each to the AFL Plan, the IBEW Plan, Painters District Council, and Medical Mutual of Omaha, and $10,000 for Andrea Kehoe. While an incentive award is appropriate, the request is far too high. I will award $10,000 each to the ALF Plan, the IBEW Plan, Painters District Counsel, and Medical Mutual of Omaha, and $5,000 to Kehoe.

Class counsel states that the class representatives "were actively engaged and willingly available to assist Class Counsel with the effective prosecution of the case. Pls.' Mem. in Support of Pls.' Motion for Final Approval of Settlement 35, Doc. No. 575. However, they provide no evidence that the representatives actually played a substantial role in the litigation, aside from sitting for depositions. Indeed, the declarations provided by the named plaintiffs show that most of them spent no more than 12 hours, over many years, on the case. *See* Miller Decl. Ex. B, Doc. 591.

These incentive awards are within the range of payments awarded by other courts in this circuit. *See, e.g., Hall,* 274 F.R.D. at 173-174 (approving incentive award of $5,000 per named plaintiff); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) ("If the named plaintiff was deposed, the named plaintiff's incentive payment will be $5,000; if the named plaintiff was not deposed, the named plaintiff's incentive payment will be $2,500"); *In re. Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 245 (E.D. Pa. 2009) (incentive award of between $5,000 and $10,500 where named plaintiffs prepared for and testified in depositions that exposed their private financial affairs, participated in preparing responses to interrogatories, and produced extensive documents).

## V. Plan of Distribution and Proposed Claim Form

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. Therefore, the proposed plan needs to be fair, reasonable and adequate. *In re Cendant Corp. Litig.*, 264 F.3d 201, 248 (3d Cir.2001). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." I*n re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D.Pa.2000). The plan of distribution, which was submitted with the Plaintiffs' memorandum in support of its motion for preliminary approval of the settlement (Doc. No. 566 at p.226-238) meets this standard.

I find that the proposed plan, submitted with Plaintiff's Motion for Preliminary Approval of Settlement (Doc. 566) is fair, reasonable, and adequate. I also find that the proposed claim form is clear, fair, and reasonable.

## VI. Conclusion

For the reasons explained above, I will grant Plaintiff's Motion for Final Approval of Settlement and their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs.

s/Anita B. Brody

Dated: ___6/19/2013_____        _____

ANITA B. BRODY, J.